# In the United States Court of Appeals for the Eleventh Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JUSTIN CASE LEBARRON,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division
Case No. 8:20-cr-156, Hon. Thomas P. Barber

## APPELLANT'S BRIEF OF JUSTIN CASE LEBARRON

Thomas A. Burns
Shannon C. Reese
BURNS, P.A.
301 West Platt Street, Suite 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com
sreese@burnslawpa.com

*Court-appointed counsel for
Justin Case Lebarron*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 and 26.1-3, the following is an alphabetical list of the trial judges, attorneys, persons, and firms with any known interest in the outcome of this case.

1. Anderson, Howard C. – Assistant Federal Public Defender;

2. Baeza, Daniel M. – Assistant United States Attorney;

3. Barber, Hon. Thomas P. – United States District Judge;

4. Beck, Kevin T. (of Law Office of Kevin T. Beck, P.A.) – Trial counsel for Defendant Michael Phelps;

5. Burns, Thomas A. (of Burns, P.A.) – Appellate counsel for Defendant-Appellant;

6. Covington, Hon. Virginia M. Hernandez – United States District Judge;

7. Flynn, Hon. Sean P. – United States Magistrate Judge;

8. Horner, Krystin – Defendant;

9. Hoppmann, Karin – Acting United States Attorney;

10. Jenkins, Hon. Elizabeth – United States Magistrate Judge;

11. Kurpiers II, Ronald J. (of Kurpiers Law Firm, P.A.) – Trial counsel for Defendant Vincent Sanchez;

12. Lebarron, Justin – Defendant-Appellant;

13. Leduc, Patrick N. (of The Law Office of Patrick N. Leduc, P.A.) – Trial counsel for Defendant-Appellant;

14. Palmieri, Lori Doganiero (of Lori D. Palmieri, P.A.) – Trial counsel for Defendant Brittney Michelle Smith;

15. Phelps, Michael – Defendant (in original indictment but not in superseding indictment);[1]

16. Porcelli, Hon. Anthony E. – United States Magistrate Judge;

17. Reese, Shannon C. (of Burns, P.A.) – Appellate counsel for Defendant-Appellant;

18. Rhodes, David P. – Assistant United States Attorney, Chief, Appellate Division;

19. Sanchez, Vincent – Defendant (in original indictment but not in superseding indictment);

20. Sansone, Hon. Amanda Arnold – United States Magistrate Judge;

21. Shein, Andrew Barrett (of The Law Offices of Andrew Shein, P.A.) – Trial counsel for Defendant Krystin Horner;

22. Smith, Brittney Michelle – Defendant;

23. Sweeney, Sarah C. – Assistant United States Attorney, Appellate Division;

24. Tuite, Christopher P. – United States Magistrate Judge for the Middle District of Florida.

No publicly traded company or corporation has an interest in the outcome of this appeal.

July 19, 2023     /s/ Thomas Burns

             Thomas A. Burns

---

[1] Not *that* Michael Phelps. *Compare* Team USA, *Michael Phelps*, at https://www.teamusa.org/usa-swimming/athletes/michael-phelps (visited July 19, 2023) (describing Olympian who won eight gold medals in swimming), *with* Doc. 372 at 24–25 (telling venire pool that a witness was "not the swimmer").

# <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellant, Justin Case Lebarron, requests oral argument. The four-day jury trial's record is somewhat extensive. But more importantly, the proper interpretation of the Controlled Substance Act's death enhancement here—including how its "use of such substance" and "results from" clauses incorporate *mens rea*, *actus reus*, and intervening cause defenses—is novel and complex. Related issues in other criminal statutes have bedeviled sister circuits, leading to sharply divided *en banc* courts filling federal reporters with many pages of conflicting opinions.

For instance, similar issues split the *en banc* D.C. Circuit 5-3. *See United States v. Burwell*, 690 F.3d 500, 502–16 (D.C. Cir. 2012) (Brown, J.) (*en banc*); *id.* at 516–17 (Sentelle, J., concurring); *id.* at 517–19 (Henderson, J., concurring); *id.* at 519–27 (Rogers, J., dissenting); *id.* at 527–53 (Kavanaugh and Tatel, JJ., dissenting). More recently, similar issues split an *en banc* panel of the Ninth Circuit 6-5. *See United States v. Collazo*, 984 F.3d 1308, 1314–36 (9th Cir. 2021) (Ikuta, J.) (*en banc* panel); *id.* at 1337–43 (Fletcher, C.J., and Thomas, Nguyen, Watford, and Hurwitz, JJ., dissenting).

Oral argument will assist the Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF CITATIONS .......................................................... vi

STATEMENT OF JURISDICTION ...................................... xiv

STATEMENT OF THE ISSUE ................................................. 1

STATEMENT OF THE CASE .................................................. 1

*Course of proceedings* ........................................................ 3

*Statement of facts* ............................................................ 5

    A.    The *in limine* order that forbade Lebarron from present-
          ing a defense to the death enhancement ............................. 5

          1.    The first day's discussion .............................. 6

          2.    The next day's ruling against Lebarron ..................... 9

          3.    The ruling's subsequent reaffirmation ..................... 11

    B.    The trial .................................................................. 12

          1.    Jury selection and opening statements ..................... 13

          2.    The testimony .......................................... 14

          3.    The jury instructions .................................. 16

          4.    Closing arguments ..................................... 18

          5.    The jury question about the death enhancement ....... 18

*Standard of review* ..................................................................... 20

SUMMARY OF THE ARGUMENT ......................................... 21

ARGUMENT AND CITATIONS OF AUTHORITY ............................ 23

I.    The *in limine* order was an abuse of discretion because it mis-interpreted the Act's death enhancement ..................................... 23

    A.    The death enhancement increases criminal penalties, including mandatory life sentences ...................................... 24

        1.    The Act criminalizes both actual distribution and the lesser included offense of possession with intent to distribute............................................. 24

        2.    The death enhancement imposes a mandatory life sentence if a defendant's prior felony drug conviction has become final, and a victim's death "results from" the "use of such substance"................................. 26

    B.    The district court misinterpreted or overlooked the death enhancement's "use of such substance" and "results from" clauses ............................................. 27

        1.    Lebarron' statutory interpretation arguments are preserved for de novo appellate review ....................... 27

        2.    Although statutory interpretation always begins with provisions' plain language, criminal statutes are presumed to require *mens rea* and *actus reus* ...... 28

            a.    Generally, criminal statutes are presumed to require *mens rea* as to all material elements .... 30

            b.    Generally, criminal statutes are presumed to require an *actus reus*........................................... 33

c. Under the rule of lenity, ambiguous criminal statutes are construed narrowly in favor of defendants ........................................................ 34

3. The death enhancement's "use of such substance" clause requires actual distribution, not mere possession with intent to distribute, that a defendant performed "knowingly or intentionally" ...................... 34

a. The *mens rea* of the "knowingly or intentionally" clause modifies the "use of such substance" clause ...................................................... 35

b. Due to its plain language and to provide fair notice, the "use of such substance" clause requires an *actus reus* of distribution, not mere possession with intent to distribute .................. 38

4. The death enhancement's "results from" clause, which requires "but-for" causation, also incorporates an intervening cause exception .......................... 44

a. The "results from" clause requires "but-for" causation............................................................ 44

b. Because the "results from" clause requires "but-for" causation, it also incorporates an intervening cause defense................................. 45

c. Lebarron had sufficient evidence to present an intervening cause defense .............................. 48

5. Continued misinterpretation of the death enhancement's "use of such substance" and "results from" clauses could lead to dubious consequences that Congress didn't envision ...................................... 49

C. The district court's grant of the government's motion *in limine*, which was based on its misinterpretation of the death enhancement, was an abuse of discretion.................. 53

D.   That abuse of discretion requires vacation of the judgment so the death enhancements in counts one and two can be retried ......................................................................... 54

    1.   The error was structural ............................................. 54

    2.   Alternatively, whether constitutional or nonconstitutional, the error still wasn't harmless ................. 56

CONCLUSION ......................................................................... 57

CERTIFICATE OF COMPLIANCE ...................................................... 59

CERTIFICATE OF SERVICE ................................................................ 60

# TABLE OF CITATIONS

**Cases**                                                                    **Page(s)**

*Arizona v. Fulminante,*
    499 U.S. 279 (1991)...................................................................... 54

*Bond v. United States,*
    572 U.S. 844 (2014)...................................................................... 35

*\*Burrage v. United States,*
    571 U.S. 204 (2014)..................................... 8, 9, 31, 36, 41, 42, 44, 46

*Cabello v. Fernandez-Larios,*
    402 F.3d 1148 (11th Cir. 2005) ......................................................... 20

*California v. Trombetta,*
    467 U.S. 479 (1984).................................................................. 55, 56

*\*Carter v. United States,*
    530 U.S. 255 (2000)...................................................................... 31

*Carter v. Nat'l R.R. Passenger Corp.,*
    2020 WL 2475085 (C.D. Cal. Jan. 24, 2020)...................................... 47

*CBS v. Primetime 24 J.V.,*
    245 F.3d 1217 (11th Cir. 2001) ......................................................... 28

*Dixon v. Burke County, Ga.,*
    303 F.3d 1271 (11th Cir. 2002) ......................................................... 47

*E.I. du Pont de Nemours & Co. v. McCain,*
    414 F.2d 369 (5th Cir. 1969) ............................................................ 46

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*
    *Trades Council,*
    485 U.S. 568 (1988)...................................................................... 29

*\*Elonis v. United States,*
    575 U.S. 723 (2015)...................................................................... 31

*Flores-Figueroa v. United States,
556 U.S. 646 (2009)............................................................ 30

Fresh Results, LLC v. ASF Holland, B.V.,
921 F.3d 1043 (11th Cir. 2019) ........................................ 43

Gundy v. United States,
139 S. Ct. 2116 (2019) ...................................................... 38

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,
530 U.S. 1 (2000)............................................................... 28

In re Winship,
397 U.S. 358 (1970)........................................................... 55

Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,
559 U.S. 573 (2010)........................................................... 35

Judd v. Haley,
250 F.3d 1308 (11th Cir. 2001) ........................................ 54

*Liparota v. United States,
471 U.S. 419 (1985)........................................................... 31

*Morissette v. United States,
342 U.S. 246 (1952).............................................. 31, 32, 33

Moyer v. Martin Marietta Corp.,
481 F.2d 585 (5th Cir. 1973) ............................................ 46

Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,
469 U.S. 189 (1985)........................................................... 29

Robert C. Herd & Co. v. Krawill Machinery Corp.,
359 U.S. 297 (1959)........................................................... 29

Rock v. Arkansas,
483 U.S. 44 (1987)............................................................. 55

*Ruan v. United States,
142 S. Ct. 2370 (2022) ........................................................ 37

Simpson v. United States,
435 U.S. 6 (1978)................................................................. 34

Sosa v. Coleman,
646 F.2d 991 (5th Cir. Unit B June 1981) ......................... 47

Standefer v. United States,
447 U.S. 10 (1980)............................................................. 36

*Staples v. United States,
511 U.S. 600 (1994)............................................. 30, 31, 32

*Torres v. Lynch,
578 U.S. 452 (2016)........................................................... 30

*United States v. Apfelbaum,
445 U.S. 115 (1980)........................................................... 33

United States v. Bailey,
444 U.S. 394 (1980)........................................................... 35

United States v. Barner,
441 F.3d 1310 (11th Cir. 2006) .................................. 20, 53

United States v. Benjamin,
958 F.3d 1124 (11th Cir. 2020) ......................................... 42

United States v. Bidwell,
451 Fed. App'x 853 (11th Cir. 2012) ................................. 55

United States v. Bohn,
2022 WL 2439586 (11th Cir. July 5, 2022) (unpublished)................. 41

United States v. Brown,
2023 WL 1861318 (6th Cir. Feb. 9, 2023) (unpublished)............. 42, 43

*United States v. Burwell,
690 F.3d 500 (D.C. Cir. 2012) (en banc)..........................i, 32

United States v. Caraballo-Martinez,
866 F.3d 1233 (11th Cir. 2017) ........................................ 43

*United States v. Chouteau,
102 U.S. 603 (1880)........................................................ 45

*United States v. Collazo,
984 F.3d 1308 (9th Cir. 2021) (en banc panel) .................i, 32

United States v. Colston,
4 F.4th 1179 (11th Cir. 2021)........................................... 37

United States v. Cornillie,
92 F.3d 1108 (11th Cir. 1996) .......................................... 25

United States v. Downs,
61 F.4th 1306 (11th Cir. 2023).......................................... 28

United States v. Feldman,
936 F.3d 1288 (11th Cir. 2019) ...................................... 9, 40

United States v. Figueroa,
165 F.3d 111 (2d Cir. 1998)............................................. 30

United States v. Frazier,
387 F.3d 1244 (11th Cir. 2004) (en banc) .......................... 20

United States v. Funches,
135 F.3d 1405 (11th Cir. 1998) ........................................ 53

United States v. Garçon,
54 F.4th 1274 (11th Cir. 2022)..................................... 29, 34

United States v. Gaudin,
515 U.S. 506 (1995)........................................................ 55

*United States v. Houston*,
  406 F.3d 1121 (9th Cir. 2005) ........................................... 41

*United States v. Irey*,
  612 F.3d 1160 (11th Cir. 2010) (*en banc*) ......................... 20

*\*United States v. King*,
  2006 WL 1139722 (W.D. Mich. Apr. 26, 2006) .................. 41

*\*United States v. King*,
  2006 WL 2367339 (W.D. Mich. Aug. 14, 2006) ........... 40, 50

*United States v. Martin Linen Supply Co.*,
  430 U.S. 564 (1977) .............................................................. 55

*United States v. Massena*,
  719 Fed. App'x 884 (11th Cir. 2017) ................................. 41

*\*United States v. Muller*,
  819 Fed. App'x 701 (11th 2020) ....................... 10, 40, 41, 46

*United States v. Nealy*,
  232 F.3d 825 (11th Cir. 2000) ........................................... 21

*United States v. Patterson*,
  38 F.3d 139 (4th Cir.1994) ................................................. 41

*United States v. Rodgers*,
  461 U.S. 677 (1983) .............................................................. 29

*\*United States v. Rodriguez*,
  279 F.3d 947 (11th Cir. 2002) ........................... 11, 44, 48, 49

*\*United States v. Ruan*,
  56 F.4th 1291 (11th Cir. 2023) ................................... 31, 37

*United States v. Sadler*,
  24 F.4th 515 (6th Cir. 2022) ............................................. 43

*United States v. Shabani,
  513 U.S. 10 (1994) ............................................................... 33

United States v. Simon,
  964 F.2d 1082 (11th Cir. 1992) ....................................... 25

United States v. Soler,
  275 F.3d 146 (1st Cir. 2002) ............................................ 41

United States v. St. Amour,
  886 F.3d 1009 (11th Cir. 2018) ....................................... 21

*United States v. U.S. Gypsum Co.,
  438 U.S. 422 (1978) ...................................................... 32, 33

United States v. Wall,
  349 F.3d 18 (1st Cir. 2003) .............................................. 41

*United States v. Webb,
  655 F.3d 1238 (11th Cir. 2011) ....................... 36, 37, 40, 41

United States v. Westry,
  524 F.3d 1198 (11th Cir. 2008) ....................................... 42

United States v. Williams,
  865 F.3d 1328 (11th Cir. 2017) .................................. 20, 53

United States v. Winchester,
  916 F.2d 601 (11th Cir. 1990) .................................... 29, 34

United States v. Wright,
  607 F.3d 708 (11th Cir. 2010) ......................................... 34

United States v. Wysinger,
  64 F.4th 207 (4th Cir. 2023) ............................................ 43

*United States v. X-Citement Video, Inc.,
  513 U.S. 64 (1994) ............................................................. 31

*Univ. of Tex. Sw. Med. Center v. Nassar,*

*United States v. Zayas-Morales,*
  685 F.2d 1272 (11th Cir. 1982) .......................................... 33

*Univ. of Tex. Sw. Med. Center v. Nassar,*
  570 U.S. 338 (2013)............................................................. 45

*Van Buren v. United States,*
  141 S. Ct. 1648 (2021) ........................................................ 38

*W. Va. ex rel. Poulos v. Fidelity & Cas. Co. of New York,*
  263 F. Supp. 88 (S.D. W.Va. 1967)..................................... 47

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ........................................................ 38

*Yates v. United States,*
  574 U.S. 528 (2015)....................................................... 35, 52

## Statutes                                            Page(s)

18 U.S.C. § 2 ......................................................................... 4

18 U.S.C. § 3231 ................................................................ xiv

18 U.S.C. § 3742 ................................................................ xiv

21 U.S.C. § 801 *et seq.* ....................................................... 24

21 U.S.C. § 841 .............................................................*passim*

21 U.S.C. § 846 .................................................. 4, 8, 24, 25

28 U.S.C. § 1291 ............................................................... xiv

## Regulations                                         Page(s)

21 C.F.R. § 1306.04 ................................................ 24, 25, 37

**Rules**                                                   **Page(s)**

Fed. R. App. P. 4 ......................................................................... xiv


**Other authorities**                                       **Page(s)**

Garland, Merrick, Office of the Attorney General,
    Additional Department Policies Regarding Charges, Pleas, and
    Sentencing in Drug Cases (Dec. 22, 2022) ......................................... 53

Garner, Bryan C., *et al.*,
    The Law of Judicial Precedent (2016) ................................................ 43

LaFave, Wayne R.,
    1 Substantive Criminal Law § 6.4 (2d ed. 2003) ................................ 45

NACDL *amicus* brief,
    *Luna-Aquino v. United States*, No. 21-7958 (S. Ct.) .......................... 30

Nelson, Caleb E.,
    *What Is Textualism?*,
    91 Va. L. Rev. 347 (2005) ............................................................ 38, 39

Sessions, Jeff, Office of the Attorney General,
    Department Charging and Sentencing Policy (May 10, 2017) .... 52, 53

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 18 U.S.C. § 3231 because Lebarron was indicted (Doc. 218) for violations of federal criminal law. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and authority to examine the sentence under 18 U.S.C. § 3742(b) because a final judgment was entered on June 17, 2021 (Doc. 286), which Lebarron timely appealed on June 23, 2021 (Doc. 289). *See* Fed. R. App. P. 4(b)(1)(A)(i) (14 days to file criminal notice of appeal).

## STATEMENT OF THE ISSUE

The district court forbade Justin Lebarron from presenting a defense that the Controlled Substances Act's death enhancement, which mandates life sentences, didn't apply because a victim, J.B., might've stolen from him the drugs that caused her overdose death. But properly construed, the death enhancement's "use of such substance" clause requires "knowing[] or intentional[]" distribution, not mere possession with intent to distribute, and its "results from" clause incorporates an intervening cause defense. Was the statute misinterpreted?

## STATEMENT OF THE CASE

Lebarron, a drug addict, sold fentanyl and methamphetamine out of a trap house. Docs. 269 at 146; 270 at 58–62. J.B. was another addict who frequented the trap house; tragically, she overdosed on fentanyl and methamphetamine and died. Doc. 269 at 138–139, 187, 195, 226–228.

A security video filmed inside the house showed that J.B. entered the trap house, sold some drugs out of the front door, entered a bedroom where Lebarron stored his personal and distribution drugs, exited the bedroom into the living room, injected herself, overdosed, and died. Docs. 269 at 88–90, 101–03, 135–138, 219–226; 270 at 64–68; *see also* Docs.

244.83 (photograph); 244.85 (photograph). But there was no testimony or evidence about how J.B. had acquired the drugs that killed her. Doc. 269 at 155–56, 170–71.

To be sure, there was no doubt that, in general, Lebarron distributed and possessed with intent to distribute fentanyl and methamphetamines. Doc. 270 at 28–29, 59–60. But there was no evidence he actually distributed the specific drugs that killed J.B. Doc. 269 at 155–56, 170–71. Thus, it was possible that J.B. had acquired the drugs from another source altogether, and it was also possible that J.B. had stolen the drugs from Lebarron. *Id.* at 145–46, 150, 154–56, 170–71.

Lebarron wanted to present both defenses at trial. Docs. 270 at 203–05; 372 at 142, 147–57, 166. The district court allowed him to present the first (*i.e.*, that J.B. may have acquired the drugs from another source altogether). Doc. 270 at 203–05. But the government moved *in limine* to exclude the second. Doc. 231, Doc. 372 at 142–179.

Eventually, the district court forbade Lebarron from presenting that second defense (*i.e.*, that J.B.'s theft of the drugs undermined the death enhancement as triggered by the possession with intent to distribute or conspiracy charges). Docs. 234; 372 at 160–63. That order was

based on the district court's interpretation of the Controlled Substances Act's death enhancement, found at 21 U.S.C. § 841(b)(1)(C), and related case law.[1]

After a four-day trial, the jury found Lebarron guilty of four drug crimes, two of which triggered the death enhancement's mandatory life penalty. Doc. 241 at 2, 4. At age 28, Lebarron was sentenced to life imprisonment in a federal penitentiary, where he remains incarcerated. Doc. 373 at 15. The central issue on appeal is whether Lebarron should've been allowed to present his theft defense to the death enhancement.

### Course of proceedings

In a superseding indictment, a grand jury charged Lebarron with conspiracy to distribute and possess with intent to distribute fentanyl and methamphetamine resulting in death (count one), distribution and possession with intent to distribute fentanyl and methamphetamine

---

[1] The Act provides, "it shall be unlawful for any person knowingly or intentionally" to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." *Id.* § 841(a)(1). As to punishment, the Act further provides that in "the case of a controlled substance in schedule I or II … such person shall be sentenced to a term of imprisonment of not more than 20 years." *Id.* § 841(b)(1)(C). But the Act's applicable death enhancement provides that "if death or serious bodily injury results from the use of such substance," then the defendant "shall be sentenced to life imprisonment." *Id.*

resulting in death (count two), possession of fentanyl with intent to distribute (count four), and maintaining a drug-involved premises (count five).[2] Doc. 218 at 1–3.

After the district court granted, in part, the government's motion *in limine*, the four-day jury trial proceeded.[3] The jury found Lebarron guilty on all four counts. Doc. 271 at 86–91. Relevant here, the jury found that J.B.'s use of the mixture or substance containing a detectable amount of fentanyl or methamphetamine that Lebarron conspired to distribute or possessed with intent to distribute (count one) and that Lebarron's distribution or possession with intent to distribute (count two) were the "but-for" causes of her death. *Id.* at 87–89.

---

[2] Specifically, count one charged violation of 21 U.S.C. § 846 as punished by § 841(b)(1)(C). Doc. 218 at 1. Count two charged violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 as punished by § 841(b)(1)(C). Doc. 218 at 2. Count four charged violation of § 841(a)(1) and (b)(1)(C) as punished by § 841(b)(1)(C). Doc. 218 at 3. Count five charged violation of § 856(a)(1). Doc. 218 at 3. The remaining counts were brought against codefendants. *Id.* at 2, 4.

[3] Lebarron timely sought judgment of acquittal on the death-enhanced charge of possession with intent to distribute (count two). Doc. 270 at 199. The district court denied the motion and ruled the video "probably" created enough evidence to go to the jury. *Id.* at 200.

Lebarron was sentenced to concurrent terms of life imprisonment as to counts one and two, a 30-year term as to count four, and a 20-year term as to count five.[4] Doc. 373 at 15. He timely appealed. Doc. 289.

## *Statement of facts*

### A. The *in limine* order that forbade Lebarron from presenting a defense to the death enhancement

Before trial began, the government orally moved *in limine* to exclude testimony and evidence that J.B. stole drugs. Doc. 231. Over a two-day period, the district court discussed and considered the issue with counsel. Docs. 372 at 142–179; 269 at 9–20. It ultimately granted the government's motion and forbade Lebarron from presenting a defense that J.B.'s theft of drugs caused her death. Docs. 234; 269 at 16, 20.

More specifically, the district court ruled that Lebarron could "elicit testimony" about the theft "as it pertains to the distribution charge." Doc. 234. But the district court also ruled that Lebarron couldn't argue that the theft undermined the death enhancement of the conspiracy or possession charges. Docs. 372 at 160–163; 269 at 16, 20. Because the jury was free to convict Lebarron for J.B.'s death on a disjunctive either/or

---

[4] This appeal concerns only counts one and two's death enhancements, not counts four or five's convictions or sentences.

basis (distribution *or* possession with intent to distribute), the ruling was outcome determinative. *See* Doc. 240 at 4–11.

The district court then teed up the issue for appeal, noting that this Court had expressly refrained from deciding whether the death enhancement had an intervening cause exception. Doc. 269 at 14–15. Indeed, it deemed it "a very good, ripe issue for appeal." *Id.* at 15.

### 1.   The first day's discussion

Lebarron's counsel had planned to argue to the jury that there was reasonable doubt about the death enhancement because it instead could've been J.B.'s theft of the drugs from Lebarron that caused her overdose death. *See* Doc. 372 at 157–166. He observed there were no cases "where if a [victim] came in and stole something, without knowledge of" the drug dealer and thereafter died "unbeknownst to" the drug dealer, the drug dealer would "end[] up looking at life in prison." *Id.* at 157. Thus, he argued that if he were forbidden from making such an argument, the Act's death enhancement would turn the underlying crime into a strict liability crime. *Id.*

He argued that'd be unlike any other crime involving death, because "in all deaths, in all deaths, there—even a manslaughter, there is

some nexus between your action and the death." *Id.* at 159. Nevertheless, he explained, the government was trying to shirk its burden to prove "any action between the accused and the death." *Id.* Instead, he said, the government was arguing it needed to prove only the lesser-included offense of possession with intent to distribute. *Id.* And once it proved that, "then life felony is going to apply." *Id.*

Although the district court agreed the theft issue was relevant to whether a *distribution* occurred, it thought it was irrelevant to the separate charges of possession with intent to distribute or conspiracy. *Id.* at 160–61. Thus, the district court ruled that if Lebarron were able to elicit testimony or marshal evidence that J.B. had been stealing drugs, counsel could "bring that up" as to the distribution of the drugs. *Id.* at 163. On the other hand, it ruled that it had no relevance to the alternative theory of possession with intent to distribute. *Id.* That was because, in its view, "apparently, according to the law, if you possess with intent to distribute a controlled substance, even if you didn't actually distribute it, because you couldn't, because someone stole it first, you're still guilty." *Id.*

Defense counsel advanced the same argument about the conspiracy count. *Id.* at 164. He said "it's the same argument all over again" because

the conspiracy charge (count one) simply refers back to the underlying possession with intent or distribution charge (count two). *Id.*; *see also* 21 U.S.C. § 846.

The district court pondered what the "but-for" causation standard of *Burrage v. United States,* 571 U.S. 204 (2014), meant if "every single person who dies after our conspiracy, we're on the hook for." Doc. 372 at 168. It struggled with where the theft evidence would come in, "if at all." *Id.* at 171–72. Defense counsel called charging Lebarron for a drug death from drugs that were potentially stolen while he slept "iron[ic]." *Id.* at 173. He argued he should at least be able to tell the jury that when J.B. stole the drugs, she was an "independent force." *Id.* at 173.

The district court agreed to examine the issue "a little bit more" before trial began the following day. *Id.* at 175–78. Meanwhile, it instructed defense counsel to completely rework his opening statement overnight: "figure out to get whatever it is you want to say through that box or through that—through that opening of the 'but-for.' And you may be—maybe it fits in there somehow or another. I'm not sure." *Id.* at 176.

### 2. The next day's ruling against Lebarron

The next day, before trial began, the district court resumed the discussion. Doc. 269 at 9. Citing *Burrage*, Lebarron argued causation:

> I'm arguing causation, Your Honor. I am saying that the actual cause of the death wasn't his intent to deliver. The actual cause of death is the theft. But for the theft, there's no death. It matters not that he has the intent to deliver. You can have the intent to deliver. That's not the actual cause of death. The actual cause of death is the actual delivering, which would then result in death, or something else that is the actual cause of death…. But the actual cause, I want to argue, of J.B.'s death was her theft, that action.

*Id.* at 10–11.

The prosecutor responded that cases like *Burrage* and *United States v. Feldman*, 936 F.3d 1288 (11th Cir. 2019), involved polydrug overdoses. Doc. 269 at 13. Thus, the question those cases addressed was which drug was the "but-for" cause of a death when multiple drugs had been ingested. *Id.* "It's addressing but-for causation when the substances go into the body." *Id.*

The district court reiterated that the theft evidence would be relevant to count two's distribution charge, but wouldn't be relevant to count two's possession-with-intent-to-distribute charge or count one's conspiracy charge "because possession with intent to distribute doesn't require actual distribution." *Id.* at 14. "I made my ruling on that." *Id.*

As for causation, the district court noted the difference between medical cause of death and the tort law concept of intervening cause. *Id.* It said it wanted to "make a good record" regarding the issue because "I actually think there is—there is an issue here—a very good ripe issue for appeal." *Id.* at 15. After some additional discussion, the district court ruled the causation argument was relevant only to distribution. *Id.* at 16.

Citing *United States v. Muller*, 819 Fed. App'x 701 (11th Cir. 2020), it noted that this Court had "never decided" whether the death enhancement contains an intervening cause exception. Doc. 269 at 19–20. The district court called the issue "a very live issue" and admitted, "I may be totally wrong"; still, it emphasized the opportunity to "take this to the circuit court of appeals" to seek an answer. *Id.* at 20. "[W]e have a heck of a lot of these fentanyl cases here," which the district court believed called out for "clarity" on the issue. *Id.* It ultimately ruled, "I'm not allowing you to make those arguments," and it suggested that the chips should "fall where they may." *Id.*

The government sought clarification that "the causation argument that defense wants to make, one that is tantamount to proximate cause

or intervening cause is something that can't be raised in opening." *Id.* at 21. The district court responded, "[c]orrect." *Id.*

Subsequently, the district court entered an endorsed order granting, in part, the government's oral motion *in limine* to exclude testimony and evidence that J.B. stole drugs. Doc. 234. Stripped of his central trial strategy, defense counsel was thus forced to argue to the jury that the government simply couldn't prove where J.B. acquired the drugs that killed her. Doc. 271 at 66–67.

### 3. The ruling's subsequent reaffirmation

During trial, the district court revisited and reaffirmed its ruling. Citing *United States v. Rodriguez*, 279 F.3d 947 (11th Cir. 2002), it said it had "no problem" if defense counsel wanted to preserve his argument, but it deemed it was "very clear from these cases that they have not gone along with" the intervening cause argument, at least with respect to factual scenarios involving the failure of others to help an overdose victim. Doc. 270 at 147.

The district court reiterated that the theft of drugs would be relevant only to distribution "because somebody can't be guilty of actually distributing something that somebody stole beforehand." Doc. 270 at 148.

It again ruled it wouldn't be relevant to the alternate basis for guilt, possession with intent to distribute, or the conspiracy charge. *Id.* at 147–48.

After the close of evidence, the district court ruled that circuit precedent precluded any argument that other people's failure to help J.B. was an intervening cause of death. *Id.* at 202. On the other hand, it also ruled that defense counsel could permissibly argue that the drugs came from somewhere besides the house. *Id.* at 203–05. Finally, it again stated that defense counsel's argument that J.B. stole the drugs would come in only with respect to whether or not drugs were distributed but wouldn't affect possession with intent or conspiracy. *Id.* at 207–08.

## B.    The trial

During trial, defense counsel cross-examined witnesses about J.B., including: (1) the circumstances surrounding her death; (2) her involvement in selling drugs; (3) her history with drug use; (4) her history of stealing drugs; (5) the lack of evidence regarding where she obtained the drugs that killed her; and (6) Lebarron's instruction to others not to give her drugs. *See infra* Statement B.2.

But defense counsel was still forbidden from arguing to the jury that J.B.'s theft of the drugs that killed her had any impact on the death

enhancement. *See, e.g.*, Docs. 234; 269 at 16–20; 270 at 207–08; 372 at 160–63. And the jury was never given such an instruction (Doc. 240), even though it asked about the source of the drugs during deliberations (*see* Docs. 243.2 at 1; 271 at 81–84; 240 at 3). Ultimately, the jury convicted Lebarron of all charges, including the death enhancements. Docs. 373 at 15; 241. He was sentenced to life imprisonment. Docs. 286 at 3; 373 at 15.

### 1. Jury selection and opening statements

During his opening statement, the prosecutor told the jury that J.B. overdosed at Lebarron's house after she finished selling drugs to customers. Doc. 269 at 36–38.

In turn, defense counsel told the jury that J.B. was known at the house as "the ostrich" because of the position she would often assume after overdosing. *Id.* at 49. He said the evidence would show Lebarron had forbidden others from selling drugs to J.B. *Id.* He suggested the evidence would show J.B. either obtained the drugs that killed her from somewhere else or, alternatively, that she stole them from Lebarron. *Id.* at 52–53. Counsel said Lebarron wasn't responsible for J.B.'s death, but

he wasn't allowed to state that J.B.'s drug theft prevented imposition of or had any effect on the death enhancement. *See id.* at 44–54.

### 2. The testimony

Lebarron and his girlfriend, Brittney Smith, were drug addicts. Doc. 269 at 74, 146. They sold drugs out of their trap house. *Id.* at 63–64, 157; Doc. 270 at 59–62. Surveillance cameras recorded activity inside that home. Doc. 269 at 80. J.B., also a drug addict, worked for Lebarron and Smith selling drugs out of the house. *Id.* at 87–88, 146, 219. Several other individuals did the same. *Id.* at 87–88, 219.

Customers would come to the front door to buy drugs. Doc. 270 at 59. They would ask for a particular drug and give money to the person working the door. *Id.* That person would take the money to Lebarron and Smith in the back bedroom, get the drugs, and return to the front door to hand the drugs to the customer. *Id.* at 59–60; Doc. 269 at 86.

Days before J.B. overdosed, Lebarron had instructed others in the house not to give her fentanyl because she had a history of overdosing. Doc. 270 at 113–114. Her nickname was the "ostrich" because, after taking drugs, she would put her head down between her knees and stick her

buttocks in the air. *Id.* at 64, 83–85. J.B. also had a history of stealing drugs. *Id.* at 80–81.

On the day she died, J.B. sold drugs out of the front door of the house. Doc. 269 at 135–39, 219–20. She went to the back bedroom several times, got drugs, and delivered them to the front door. *Id.* at 219–20, 225. Surveillance showed her leaving the back bedroom with what appeared to be a syringe in her right hand and a shiny object in her left hand. *Id.* at 88–89, 101–03; *see also* Doc. 244.83 (photograph).

Within minutes after leaving the bedroom, J.B. injected herself with something in the living room and lay face first on the floor. Docs. 269 at 87–90; 270 at 64; *see also* Doc. 244.85 (photograph). She stopped moving shortly thereafter and died. Docs. 269 at 219–228; 270 at 64–68.

The government marshaled little evidence of what J.B. was doing at all times in the days before she died, couldn't say what she may have been keeping in the back bedroom, and couldn't specify where she got the drugs that killed her. Doc. 269 at 145–150, 153–56. Although Lebarron was in the back bedroom when J.B. exited with the objects in her hands, nobody could say whether he was awake, asleep, or unconscious. *Id.* at 86–87, 135, 149, 175. Detective Collins couldn't point to any evidence that

showed Lebarron giving J.B. the drugs she died from. *Id.* at 170–71. He also agreed that drug addicts can maintain their drug habit by giving customers only a portion of the drugs they've purchased and keeping the rest for themselves. *Id.* at 136–37.

Dr. Noel Palma, a medical examiner, performed an autopsy. *Id.* at 176–78. Toxicology results from J.B.'s blood found over nine times the lethal amount of fentanyl and triple the lethal amount of methamphetamines. *Id.* at 183–84, 187. Thus, Dr. Palma testified that this overdose on fentanyl and methamphetamines killed J.B. *Id.* at 195.

### 3. The jury instructions

On count one, the jury was instructed to determine whether "two or more people in some way agreed to try to accomplish a shared and unlawful plan to distribute *or possess with intent to distribute* a mixture or substance containing a detectable amount of fentanyl or methamphetamine, and, two, the Defendant knew the unlawful purpose of the plan and willfully joined in it." Doc. 271 at 12 (emphasis added). As to J.B.'s death, the jury was instructed, "If you determine that the Defendant is guilty of conspiring to distribute, *or possess with intent to distribute* a mixture or substance containing fentanyl or methamphetamine, you will

then need to determine if victim J.B.'s use of the mixture or substance that the Defendant conspired to distribute *or possess with intent to distribute* was the but-for cause of J.B.'s death." *Id.* at 14 (emphasis added).

On count two, the jury was instructed to determine whether "one, the defendant knowingly or intentionally distributed *or possessed with intent to distribute* a controlled substance, that is, a mixture and substance containing a detectable amount of fentanyl or methamphetamine and, two, the defendant knew at the time of distribution that the substance he distributed or possessed with intent to distribute was a controlled substance." *Id.* at 16 (emphasis added). Regarding J.B.'s death, the jury was instructed to determine "if [her] use of the mixture or substance that the Defendant distributed, *or possessed with an intent to distribute* was the 'but-for' cause of J.B.'s death." *Id.* at 17 (emphasis added).

The jury was also instructed that the law recognizes several kinds of possession. "A person may have actual possession, constructive possession, sole possession, or joint possession." *Id.* "Constructive possession of a thing occurs if a person doesn't have actual possession of it but has both the power and the intention to take control over it later." *Id.*

### 4. Closing arguments

Given the district court's *in limine* order, defense counsel was hamstrung to argue at closing that the government hadn't marshaled any evidence indicating where J.B. got the drugs. Doc. 271 at 56–57. Other than a video of J.B. doing drugs approximately 40 hours before her death, the government couldn't show where she had been or from whom she acquired drugs in the time preceding her death. *Id.* at 59. He also reminded the jury about testimony that drug addicts have multiple sources for their drugs and that there was no video evidence of J.B. preparing any drugs before she injected them. *Id.* at 61, 63–64.

### 5. The jury question about the death enhancement

During deliberations, the jury asked the district court a question about an introductory instruction that addressed the drugs in counts one and two. Doc. 271 at 81–84. The question concerned the introductory instruction that counts one and two charged that "a person identified as J.B. died as a result of the use of *the* mixture and substance containing a detectable amount of fentanyl and methamphetamine." *See id.* at 81–84; Doc. 240 at 3 (emphasis added). Specifically, the jury asked whether "the word 'the'" in the introductory instruction actually "mean[t] 'the drugs

she took on the video' are drugs from 'JL's drug business' or is it not that specific??" Doc. 243.2 at 1.

Addressing counsel, the district court observed, "really what they're getting at is the same thing that's perplexed us somewhat in the case, which is what ended up being the main defense argument": "[i]f she just died of the drugs in the trailer is that enough, or do the drugs have to be somehow connected to Mr. Lebarron?" Doc. 271 at 82–83. Regarding the introduction to offenses instruction, the court admitted that no connection to Lebarron had been built into it. *Id.* at 83. The introduction said that counts one and two charged that J.B. died as a result of the "use of the mixture and substance containing a detectable amount of fentanyl and methamphetamine." Doc. 240 at 3. But count one's instruction further specified that the jury needed to find whether J.B.'s "use of the mixture or substance *that the defendant conspired to distribute or possess with intent to distribute* was the 'but-for' cause of J.B.'s death." *Id.* at 6 (emphasis added). And, similarly, count two's instruction required the jury to find whether J.B.'s use of the mixture or substance "*that the defendant distributed, or possessed with intent to distribute*, was the 'but-for' cause of J.B.'s death." *Id.* at 10 (emphasis added).

With the parties' consent, the district court told the jury that the introductory instruction was "intended only as an introductory summary of the law you must apply," which was "explained in greater detail later in the instructions." Docs. 271 at 84; 243.2 at 2. Thus, the district court told the jury it "should not base [its] decision on anything contained in paragraph 3." *Ibid.* Within 30 minutes, the jury returned a guilty verdict on all four counts, including the death enhancements. Doc. 271 at 87–89.

## Standard of review

Evidentiary rulings, including orders on motions *in limine*, are reviewed for abuse of discretion.[5] *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (*en banc*); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005). Under abuse-of-discretion review, "errors of law receive no deference." *United States v. Barner*, 441 F.3d 1310, 1315 n.5 (11th Cir. 2006). Rather, "[b]asing an evidentiary ruling on a legal error constitutes an abuse of discretion *per se*." *United States v. Williams*, 865 F.3d 1328, 1337 (11th Cir. 2017).

---

[5] "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*).

Statutory interpretation questions are reviewed de novo. *United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir. 2018). Structural error claims are reviewed de novo. *See United States v. Nealy*, 232 F.3d 825, 829 (11th Cir. 2000) (structural error "require[s] *per se* reversal").

## SUMMARY OF THE ARGUMENT

When it prevented Lebarron from presenting a defense that J.B. stole the drugs on which she overdosed and died, the district court misinterpreted or overlooked parts of the Act's death enhancement. In reality, the death enhancement's plain language contains two crucial, textual limitations. The first is the "use of such substance" clause, and the second is the "results from" clause. 18 U.S.C. § 841(b)(1)(C).

Properly construed, the "use of such substance" clause requires actual distribution, not mere possession with intent to distribute, which was done "knowingly or intentionally." *See infra* Argument I.B.2. That's because, applying longstanding canons of statutory construction, before the death enhancement can apply, the government must prove both a criminal *actus reus* (here, actual distribution, not mere possession with intent to distribute) and a criminal *mens rea* (here, that a distribution ultimately reaching the victim was done "knowingly or intentionally").

Thus, a defendant can't be criminally responsible for a victim's "use" of a controlled substance that a defendant has merely possessed with intent to distribute unless the defendant has first "knowingly or intentionally" distributed it. (Telekinesis isn't a thing.) And even if the plain language were ambiguous, the rule of lenity would still require the death enhancement to be construed in Lebarron's favor.

Similarly, this Court should answer the question it has repeatedly left open and, once again applying longstanding canons of statutory construction, hold the Act's "results from" clause incorporates an intervening cause defense. *See infra id.* I.B.3. At common law, prosecutors had to prove factual causation. Thus, intervening cause was a good defense. Because the Supreme Court has already held the "results from" clause incorporates the prosecutor's common law burden to prove factual cause, so too must it also incorporate an intervening cause defense.

The district court's misinterpretation of the Act, which caused it to abuse discretion in issuing the *in limine* order that forbade Lebarron from presenting a complete defense (*see infra id.* I.C), was either a structural error or a harmful error (*see infra id.* I.D). Lebarron was forbidden from arguing at trial that J.B.'s theft of the drugs meant the death

enhancement element lacked sufficient evidence. That ruling produced the backwards result that J.B.'s theft could've absolved Lebarron of the death enhancement had the government charged him with only the greater offense of distribution. But because the government also charged him with the lesser included offense of possession with intent to distribute, the theft became inconsequential to the death enhancement.

The judgment should be vacated, and counts one and two should be remanded for retrial at which Lebarron can present a complete defense.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. The *in limine* order was an abuse of discretion because it misinterpreted the Act's death enhancement

The district court misinterpreted or overlooked parts of the death enhancement. In reality, its "use of such substance" clause requires actual distribution, not mere possession with intent to distribute (*see infra* Argument I.B.2), and its "results from" clause necessitates an intervening cause exception (*see infra id.* I.B.3). This error of law, upon which the *in limine* order was based, was by definition abuse of discretion. *See infra id.* I.C. And whether the error was structural, not harmless beyond reasonable doubt, or harmful (*see infra id.* I.D.1–2), the judgment should be vacated for retrial of counts one and two.

## A. The death enhancement increases criminal penalties, including mandatory life sentences

Generally, the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, criminalizes the distribution or possession with intent to distribute a controlled substance, *id.* § 841(a). It also criminalizes conspiracy with others to do either. *Id.* § 846. If a death "results from" the "use of such substance," increased penalties can apply. *E.g.*, *id.* § 841(b)(1)(C). Because Lebarron had a prior conviction for a serious drug felony (Docs. 67 at 3 (notice of prior serious drug felony conviction); 67.1 at 1–6 (judgment of state court drug felony conviction)), his criminal history made him potentially subject to the death enhancement's mandatory life sentence. *Id.*

### 1. The Act criminalizes both actual distribution and the lesser included offense of possession with intent to distribute

Except as authorized, *see* 21 C.F.R. § 1306.04(a) (allowing practitioners with DEA licenses to issue or dispense prescriptions for controlled substances), the Act provides it's a crime for anyone "knowingly or intentionally" to "manufacture, distribute, or dispense, *or* possess with intent to manufacture, distribute, or dispense a controlled substance," 21 U.S.C. § 841(a)(1) (emphasis added). A defendant can be charged in the

conjunctive, whereas a jury can be instructed in the disjunctive. *United States v. Cornillie*, 92 F.3d 1108, 1110 (11th Cir. 1996).

Consistent with the Act, Lebarron was charged with both distribution and possession with intent to distribute fentanyl and methamphetamine. Doc. 218 at 2. Also consistent with the Act, the jury was instructed it could find that Lebarron either distributed or possessed with intent to distribute any of the controlled substances. Doc. 240 at 8, 16. The jury wasn't, however, instructed that the death enhancement applied only to actual distribution, not mere possession with intent to distribute.[6] *See* Doc. 240 at 6, 10.

In turn, except when authorized, *see* 21 C.F.R. § 1306.04(a), it's also a crime to conspire to distribute or possess with intent to distribute controlled substances. 21 U.S.C. § 846. Conspiracy is "subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." *Id.* For conspiracy, the jury was disjunctively instructed to return a guilty verdict if Lebarron willfully

---

[6] The putative error preserved for appellate review concerns the *in limine* order, not the jury instructions. But the erroneous lack of such a jury instruction is potentially relevant to harmfulness. *E.g.*, *United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) (error was harmless because juries are presumed to follow their instructions).

joined an unlawful plan *either* to distribute *or* possess with intent to distribute a controlled substance. Doc. 240 at 5; *see also supra* note 6.

> ### 2. The death enhancement imposes a mandatory life sentence if a defendant's prior felony drug conviction has become final, and a victim's death "results from" the "use of such substance"

When a defendant "violates subsection (a)" by "knowingly or intentionally" distributing or possessing with intent to distribute a "schedule I or II" controlled substance, such as fentanyl or methamphetamine, the standard penalty is "a term of imprisonment of not more than 20 years." 21 U.S.C. § 841(b)(1)(C). But the Act's penalty subsections contain death enhancements that can trigger optional or mandatory life sentences. *Id.*

The first death enhancement, generally applicable to all defendants, provides that the defendant "shall be sentenced to a term of imprisonment of not less than twenty years or more than life." *Id.* (emphases added). Thus, under it, life sentences are possible, but not mandatory. *Id.* The second death enhancement, applicable to defendants like Lebarron (*see* Docs. 275 at 15–19; 373 at 4) whose "prior conviction for a felony drug offense has become final," imposes a mandatory life sentence. *Id.* Both

death enhancements are triggered "if death or serious bodily injury *results from* the *use of such substance*." *Id.* (emphases added).[7]

## B. The district court misinterpreted or overlooked the death enhancement's "use of such substance" and "results from" clauses

When it granted the government's motion *in limine*, the district court misinterpreted or overlooked the death enhancement's "use of such substance" and "results from" clauses.

### 1. Lebarron' statutory interpretation arguments are preserved for de novo appellate review

Because Lebarron took the position, in a defensive posture, that the government's motion *in limine* should be denied, he preserved the issue for appellate review about how to interpret the statute, and he's entitled to raise any appellate arguments in favor of his position. Litigants "'can most assuredly waive [or forfeit] positions and issues on appeal, but not individual arguments.'" *Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018); *accord Jacob v. Mentor Worldwide, LLC*, 40 F.4th 1329, 1336–37 (11th Cir. 2022).

---

[7] Elsewhere, the Act contains other similar death enhancements. *See* 21 U.S.C. § 841(b)(1)(A); *id.* § 841(b)(1)(B).

Were the rule otherwise, appellate courts "could never expect the quality and depth of argument to improve on appeal," which would be "an unfortunate result." *Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883 n.5 (11th Cir. 2017). Simply put, "there can be no forfeiture 'where the district court nevertheless addressed the merits of the issue'"; thus, "[w]hen a district court resolves an issue, the losing party can challenge it." *Hi-Tech Pharm., Inc.*, 910 F.3d at 1194; *accord United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707 (D.C. Cir. 2009).

### 2. Although statutory interpretation always begins with provisions' plain language, criminal statutes are presumed to require *mens rea* and *actus reus*

"We begin, as always, with the statute's plain language." *United States v. Downs*, 61 F.4th 1306, 1311 (11th Cir. 2023). That's because "[t]he language of our laws is the law." *CBS v. Primetime 24 J.V.*, 245 F.3d 1217, 1227 (11th Cir. 2001). As such, courts can't read words into statutes. *E.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000) (rejecting statutory interpretation because Congress "could easily have used the formulation just suggested"); *accord*

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 197 (1985); *United States v. Rodgers*, 461 U.S. 677, 707 (1983).

But when interpreting statutes, courts can and should consult canons of statutory construction. *See United States v. Garçon*, 54 F.4th 1274, 1277–85 (11th Cir. 2022) (*en banc*) (consulting multiple canons to interpret the word "and"). Two such canons are that courts often read *mens rea* and *actus reus* requirements into criminal statutes. *See infra* Argument I.B.1.a–b. Those canons are corollaries to the perhaps better known canons that statutes in derogation of common law are strictly construed, *see Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 304 (1959), and that statutory interpretations that would otherwise raise serious constitutional issues should be avoided, *see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Another canon is the rule of lenity. *See infra* Argument I.B.1.c. That canon, which embodies lenience or mercy, applies the "common law principle" that criminal statutes must be strictly construed in favor of defendants. *United States v. Winchester*, 916 F.2d 601, 607 (11th Cir. 1990).

### a. Generally, criminal statutes are presumed to require *mens rea* as to all material elements

As to *mens rea*,[8] the Supreme Court has "long recognized that determining the mental state required for commission of a federal crime requires construction of the statute and inference of the intent of Congress." *Staples v. United States*, 511 U.S. 600, 605 (1994). Thus, when a federal criminal statute contains a *mens rea* term such as "knowingly" or "intentionally," that clearly indicates congressional intent to require some culpable mental state. *E.g.*, *United States v. Figueroa*, 165 F.3d 111, 119 (2d Cir. 1998) (Sotomayor, J.) ("[b]y using the word 'knowingly,' Congress chose to include some knowledge requirement for a conviction").

And absent a contrary indication of congressional intent, such a *mens rea* requirement would apply to each material element of the offense. *See Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element"); *accord Torres v. Lynch*, 578 U.S. 452, 467 (2016); *see also*

---

[8] For a discussion of how the *mens rea* requirement has evolved throughout history, see Stanford Law School's Prof. Jeff Fisher's *amicus* brief for NACDL in *Luna-Aquino v. United States*, No. 21-7958 (S. Ct.), *at* https://tinyurl.com/bded82km (visited July 19, 2023).

*United States v. Ruan*, 56 F.4th 1291, 1296 (11th Cir. 2023) (acknowledging "§ 841(a)'s scienter provision (requiring the defendant to act 'knowingly or intentionally') applied not only to the statute's *actus reus*—here dispensing—but also to the 'except as authorized' exception"). Punishment enhancements, including the death enhancement at issue here, are still elements of a crime. *See Burrage*, 571 U.S. at 220 (death enhancement is a material element that must be submitted to a jury).

Moreover, statutory silence, by itself, doesn't necessarily mean Congress intended to dispense with *mens rea* as an element of the crime. *Morissette v. United States*, 342 U.S. 246, 263 (1952); *Elonis v. United States*, 575 U.S. 723, 734 (2015). That's because "we must construe the statute in light of the background rules of the common law, in which the requirement of some *mens rea* for a crime is firmly embedded." *Staples*, 511 U.S. at 605. Thus, before eliminating *mens rea*, "some indication of congressional intent, express or implied, is required." *Id.* at 606.[9]

---

[9] Still, the "presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 269 (2000) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)); *accord Liparota v. United States*, 471 U.S. 419, 426 (1985) ("to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct"). Based on this principle, sister

The only potentially applicable exception in which congressional silence can be treated as imposing "a form of strict criminal liability" is limited to certain public welfare or regulatory offenses. *Staples*, 511 U.S. at 606–07.[10] Typically, "such offenses involve statutes that regulate potentially harmful or injurious items" or activities that put individuals on notice of the likelihood of regulation, *id.* at 607, and impose relatively small penalties, *Morissette*, 342 U.S. at 254, 256 (regulatory offenses' penalties "commonly are very small," and "conviction does no grave damage to an offender's reputation"). But such strict liability crimes exist in very "limited circumstances" due to their "generally disfavored status." *Staples*, 511 U.S. at 607; *accord United States v. U.S. Gypsum Co.*, 438 U.S.

---

circuits have occasionally—and mistakenly—held that *mens rea* never extends to "elements that do not separate innocent from wrongful conduct." *United States v. Collazo*, 984 F.3d 1308, 1325 (9th Cir. 2021) (*en banc* panel); *accord United States v. Burwell*, 690 F.3d 500, 516 (D.C. Cir. 2012) (*en banc*) (*mens rea* presumption was "[h]istorically" meant to protect "the altar boy archetype, *i.e.*, innocent conduct"). But powerful dissents pilloried those close *en banc* decisions (6-5 in *Collazo*, 5-3 in *Burwell*) because they conflict with general principles and Supreme Court precedent. *See Collazo*, 984 F.3d at 1336–43 (Fletcher, C.J., and Thomas, Nguyen, Watford, and Hurwitz, JJ., dissenting); *Burwell*, 690 F.3d at 519–27 (Rogers, J., dissenting); *id.* at 527–53 (Kavanaugh and Tatel, JJ., dissenting).

[10] There's another exception, albeit inapplicable here, for jurisdictional elements. *See Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019).

422, 437–38 (1978); *Morissette*, 342 U.S. at 251 (notion that crime requires intention is "universal and persistent").

### b. Generally, criminal statutes are presumed to require an *actus reus*

As with *mens rea*, criminal statutes are also presumed to include an *actus reus* requirement: "In the criminal law, both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur." *United States v. Apfelbaum*, 445 U.S. 115, 131 (1980); *see also United States v. Shabani*, 513 U.S. 10, 16 (1994) ("the law does not punish criminal thoughts," but a conspiratorial agreement can be a prosecutable *actus reus*).

This "compound" concept of a crime requires both "an evil-meaning mind" and "an evil-doing hand." *United States v. Zayas-Morales*, 685 F.2d 1272, 1276 (11th Cir. 1982) (quoting *Morissette*, 342 U.S. at 251 (concurrence)). The idea that an injury is criminal only if inflicted intentionally "is as universal and persistent in mature systems of law as belief in freedom of the human will" and acknowledges the choice between doing good or doing evil. *Id.*

### c. Under the rule of lenity, ambiguous criminal statutes are construed narrowly in favor of defendants

"The rule of lenity is a canon of statutory construction that requires courts to construe ambiguous criminal statutes narrowly in favor of the accused." *United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010). "The rule applies 'not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose.'" *Garçon*, 54 F.4th at 1285. Under this rule, courts won't interpret a federal criminal statute as increasing a penalty "when such an interpretation can be based on no more than a guess as to what Congress intended." *United States v. Winchester*, 916 F.2d 601, 607 (11th Cir. 1990) (quoting *Simpson v. United States*, 435 U.S. 6, 14–15 (1978)).

### 3. The death enhancement's "use of such substance" clause requires actual distribution, not mere possession with intent to distribute, that a defendant performed "knowingly or intentionally"

Applying those canons here, the death enhancement's "use of such substance" clause requires actual distribution—not mere possession with intent to distribute—that a defendant performed "knowingly or intentionally." That's because § 841(a)'s "knowingly or intentionally" clause is presumed to modify every material element, including the material

element contained in § 841(b)(1)(C)'s "use of such substance" clause, and it's impossible for a defendant to "knowingly or intentionally" act in a way that a victim will "use … such substance" if she unexpectedly stole it. Thus, Lebarron should've been allowed to present his theft defense.

### a. The *mens rea* of the "knowingly or intentionally" clause modifies the "use of such substance" clause

The scienter elements of acting "knowingly" or "intentionally" are chameleons, which change their colors in different statutory contexts. *See Yates v. United States,* 574 U.S. 528, 537 (2015) (statutory language must be viewed in the specific context in which that language is used); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 585 (2010) (the terms "knowing" and "intentional" are construed in light of their particular statutory context). But generally speaking, a defendant acts "knowingly" when he has an awareness that something will happen to a high probability or practical certainty. *See United States v. Bailey*, 444 U.S. 394, 405 (1980) (intention or purpose "corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent"). Similarly, a defendant acts "intentionally" when he has a conscious object or desire. *See id.*

Here, Lebarron wanted to present a defense that he lacked *mens rea* and committed no *actus reus* that resulted in J.B.'s overdose and death because (1) he didn't know to a high probability or practical certainty that she would steal his drugs, (2) he had no conscious object or desire that she would steal his drugs, and (3) he didn't distribute any of his drugs to J.B. Indeed, Lebarron's knowledge and intention were quite the opposite. Lebarron knew J.B. often overdosed on drugs. Doc. 270 at 83–85, 114. For that reason, he refused to give her drugs and forbade other people from giving her drugs. *Id.* at 113.

Moreover, there's nothing surprising about § 841(a)'s "knowingly or intentionally" clause modifying § 841(b)(1)(C)'s "use of such substance" clause. For starters, *mens rea* requirements are presumed to extend to all material elements (*see supra* Argument I.A.1.a), which would include the "use of such substance" clause. *See Burrage*, 571 U.S. at 220 (death enhancement is a material element that must be submitted to a jury). Without that *mens rea* element's satisfaction, neither of § 841(b)(1)(C)'s death enhancements could apply. *See id.*[11]

---

[11] That doesn't mean that the "knowingly or intentionally" clause refers to a *mens rea* that a death itself will result. Courts have correctly rejected that theory. *See, e.g., United States v. Webb*, 655 F.3d 1238, 1241,

In that vein, courts have already held the "knowingly or intentionally" clause doesn't modify only § 841(a)'s two *actus rei* of distribution or possession with intent to distribute. For instance, as this Court acknowledged on remand from *Ruan v. United States*, 142 S. Ct. 2370 (2022), "§ 841(a)'s scienter provision (requiring the defendant to act 'knowingly or intentionally') applie[s] not only to the statute's *actus reus*—here dispensing—but also to [21 C.F.R. § 1306.04's] 'except as authorized' exception." *Ruan*, 56 F.4th at 1296.

---

1250 (11th Cir. 2011) (rejecting notion that death enhancement incorporates foreseeability or proximate cause requirement because "we join several of our sister circuits and hold that § 841(b)(1)(C)'s enhanced penalty requires only proof that the death resulted from the victim's use of a controlled substance *dispensed by* the defendant" (emphasis added)). Nor does it refer to a *mens rea* of precisely what kind of controlled substance it was. *See United States v. Colston*, 4 F.4th 1179, 1188–89 (11th Cir. 2021). Rather, it means that the *mens rea* requires "knowing[]" or "intentional[]" conduct that a third person will actually use the controlled substance "dispensed by," *id.*, or distributed by the defendant, regardless whether the defendant knows or intends that (1) its chemical composition be precisely such-and-such or (2) the victim's liver, kidneys, and spleen will successfully and safely metabolize it or not. In that regard, *Colston*'s statement that § 841(b) "has no *mens rea* requirement" is improvident dictum that overreaches that case's facts. *See infra* note 13.

### b. Due to its plain language and to provide fair notice, the "use of such substance" clause requires an *actus reus* of distribution, not mere possession with intent to distribute

Lastly, it would be deeply troubling and unexpected if the *actus reus* of mere possession with intent to distribute (or conspiracy to do so), as opposed to actual distribution (or conspiracy to do so), were to have any criminal connection to a victim's overdose death. That's because it's impossible for a victim to overdose on drugs unless a defendant has first put the drugs into the chain of distribution. On this plane of existence, telekinesis doesn't exist. And if Congress intended to the contrary that defendants could be imprisoned for the rest of their lives without regard to what *actus reus* they committed, it needed to speak more clearly. *Cf. West Virginia v. EPA*, 142 S. Ct. 2587, 2607–09 (2022) (discussing major questions doctrine in agency delegation context); *Gundy v. United States*, 139 S. Ct. 2116, 2141–42 (2019) (Gorsuch, Roberts, and Thomas, JJ., dissenting) (discussing major questions doctrine in criminal context).

Indeed, Lebarron's reading of the statute is consistent with "the way that an 'appropriately informed' speaker of the language would understand the meaning," *Van Buren v. United States*, 141 S. Ct. 1648 (2021) (quoting Caleb E. Nelson, *What Is Textualism?*, 91 Va. L. Rev. 347,

354 (2005)), of the entire phrase "the use of such substance." A substance can't be used unless it is first obtained, and it can't be obtained in a criminal sense unless the defendant has first distributed or dispensed it.

This plain reading is also bolstered by a review of the jury instructions, which informed the jury that "to distribute" meant "to deliver possession of or transfer a controlled substance to someone else." Doc. 240 at 9. They also informed the jury that the law "recognizes several kinds of possession." *Id.* The instructions noted that "[a] person may have actual possession, constructive possession, sole possession, or joint possession." *Id.* Actual possession was defined as "direct physical control" whereas constructive possession was defied as "the power and the intention to take control over it later." *Id.*

So, in this case it's possible that Lebarron was convicted because the jury concluded he had the "power and intention to take control" over the fentanyl or methamphetamines later and that J.B. died as a result of those same drugs that Lebarron had intended to take control over at some later time. *See id.* at 4–10. Essentially, the instructions required no causal connection between Lebarron's conduct and J.B.'s death.

Moreover, there's an inherent problem in convicting a defendant for a drug death linked solely to possession with intent to distribute: namely, fair notice. *See United States v. King*, 2006 WL 2367339, at *4 (W.D. Mich. Aug. 14, 2006). In *King*, applying that fair-notice standard, a district court left in place a death-enhanced distribution charge, but dismissed a death-enhanced possession-with-intent-to-distribute charge. *Id.* It explained, "to show that the same drug possessed by Defendant was [also] the drug used by [the victim] that resulted in his death, the government will necessarily have to show a connection or nexus between Defendant's activities and [the victim]'s use." *Id.*

Thus, *King* ruled it'd be unfair to hold a defendant criminally liable for a death "based simply upon his mere possession of a drug." *Id.* It also noted that it isn't surprising that most death enhancement cases are distribution cases given the difficulty in proving that the same drugs distributed caused a death "let alone" the same drugs simply possessed by a defendant. *Id.* at *3.[12]

---

[12] As *King* recognized, most death enhancements involve distribution charges, not mere possession with intent to distribute. *E.g.*, *United States v. Feldman*, 936 F.3d 1288, 1297–1314 (11th Cir. 2019) (affirming death-enhanced conviction against physician); *United States v. Webb*, 655 F.3d 1238, 1241, 1254–55 (11th Cir. 2011) (same); *see also United States*

In a prior order, the *King* court had noted that other circuits had described the death enhancement as requiring distribution. *United States v. King*, 2006 WL 1139722, at \*2 (W.D. Mich. Apr. 26, 2006) (citing *United States v. Houston,* 406 F.3d 1121, 1124–25 (9th Cir. 2005), *United States v. Wall,* 349 F.3d 18, 24–25 (1st Cir. 2003), and *United States v. Patterson,* 38 F.3d 139, 145 (4th Cir. 1994)). Those cases all involved defendants facing death-enhanced distribution charges. *See Houston,* 406 F.3d at 1122, *Wall,* 349 F.3d at 20, and *Patterson,* 38 F.3d at 141.

Other cases have also used language suggesting that a death enhancement requires distribution, although those cases similarly involved distribution charges. *See, e.g.*, *United States v. Soler*, 275 F.3d 146, 152 (1st Cir. 2002) (death enhancement applies when death results from the use of drugs "*supplied by* the defendant" (emphasis added)); *Webb*, 655 F.3d at 1250 (death enhancement "requires only proof that the death resulted from the victim's use of a controlled substance *dispensed* by the defendant" (emphasis added))). In fact, even *Burrage* inserted the word

---

v. *Muller*, 819 Fed. App'x 701, 703, 712 (11th 2020) (affirming death-enhanced conviction against drug dealer); *United States v. Massena*, 719 Fed. App'x 884, 886 (11th Cir. 2017) (same); *United States v. Bohn*, 2022 WL 2439586, at \*1–5 (11th Cir. 2022) (unpublished) (same).

"distributed" when discussing the death enhancement. 571 U.S. at 209 ("these default sentencing rules do not apply, however, when 'death or serious bodily injury results from the use of [the distributed] substance'" (brackets in original) (quoting 21 U.S.C. § 841(b)(1)(A)–(C))).

This Court used language suggesting a distribution was necessary in a case involving a charge for conspiracy to possess with intent to distribute tied to the death enhancement. *See United States v. Westry*, 524 F.3d 1198, 1203 (11th Cir. 2008). There, even though the charge was for conspiracy to possess with intent to distribute, the court referenced drugs "distributed during the course of the conspiracy" and conspirators involved in "distributing drugs to addicts." *Id.* at 1219. Similarly, in *United States v. Benjamin*, this Court held a district court "correctly" instructed the jury that it must find "the controlled substance *distributed* by the defendant" was a but-for cause of the victim's death before convicting for a death-enhanced conspiracy to possess with intent to distribute. 958 F.3d 1124, 1128, 1132 n.4 (11th Cir. 2020) (emphasis added).

After *Burrage*, other circuits have also limited the death enhancement's reach. For example, the Sixth Circuit limited the death enhancement's scope in conspiracy cases. *United States v. Brown*, 2023 WL

1861318, at *2 (6th Cir. 2023) (unpublished). *Brown* held that when a defendant's underlying crime is drug conspiracy, the enhanced sentence can't apply unless a jury found that a defendant "was part of the distribution chain that led to the victim's overdose." *Id.* (citing *United States v. Sadler*, 24 F.4th 515, 560 (6th Cir. 2022)). In a conspiracy case, which can impose liability based on a coconspirator's actions, this requirement ensures a link between the death and the defendant's own conduct.[13]

---

[13] In *dicta*, the Fourth Circuit suggested a contrary interpretation: "Nothing in the statute requires a jury to find that the defendant actually delivered the drug to the victim in order for the increased penalty to apply." *United States v. Wysinger*, 64 F.4th 207, 216 (4th Cir. 2023). But *Wysinger* is distinguishable because it involved actual distribution, not mere possession with intent to distribute. *Id.* at 210 ("Wysinger provided fentanyl to two women who overdosed," "left the women for dead," and "destroyed the evidence"). And it's well established that "'regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.'" *Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019) (citation omitted); *accord United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244–45 (11th Cir. 2017) (distinguishing *obiter dicta* from holdings); *see also* Bryan C. Garner *et al.*, The Law of Judicial Precedent 47 (2016) ("no court has the power to establish a legal rule on facts not before it").

4. **The death enhancement's "results from" clause, which requires "but-for" causation, also incorporates an intervening cause exception**

The death enhancement's "results from" clause requires "but-for" causation. As such, it also incorporates an intervening cause exception. When the district court ruled otherwise, it misinterpreted it.[14]

a. **The "results from" clause requires "but-for" causation**

The leading authority about what the death enhancement's "results from" clause means is *Burrage*, 571 U.S. at 218–19.[15] There, the Supreme Court held it requires "but-for" causation. *Id.* Thus, if a drug supplied by the defendant merely "contribute[d] to, but [was] not a but-for cause of, the victim's death," the death enhancement couldn't apply. *Id.* at 206.

*Burrage* addressed whether a specific drug caused a death when various drugs were found in a victim's system. 571 U.S. at 207. But it also discussed at length the connection between a defendant's conduct and a death. *Id.* at 210–11. Specifically, it held, "[w]hen a crime requires

---

[14] This Court has repeatedly left open the question about whether an intervening cause exception exists. *E.g.*, *United States v. Rodriguez*, 279 F.3d 947, 951–52 (11th Cir. 2002); *see also United States v. Muller*, 819 Fed. App'x 701, 711 n.5 (11th Cir. 2020).

[15] *Burrage* didn't interpret the death enhancement's "use of such substance" clause. *See id.*

'not merely conduct but also a specified result of conduct,' a defendant generally may not be convicted unless his *conduct* is 'both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result." *Id.* at 210 (citing Wayne R. LaFave, 1 Substantive Criminal Law § 6.4(a), at 464–66 (2d ed. 2003)) (punctuation omitted).

Thus, this factual causation element requires proof "that the harm would not have occurred in the absence of—that is, but for—the *defendant's* conduct." *Id.* at 211 (emphasis added) (citing *Univ. of Tex. Sw. Med. Center v. Nassar*, 570 U.S. 338, 346–47 (2013)).

> **b.** **Because the "results from" clause requires "but-for" causation, it also incorporates an intervening cause defense**

At common law, because factual causation was a material element, intervening cause was a good defense: "[i]f, for example, a party should charge another with inflicting upon his person a wound by which he lost an arm, it would be a good defense to show that the loss resulted from unskillful medical treatment or neglect and not from the wound inflicted." *United States v. Chouteau*, 102 U.S. 603, 609 (1880). Thus, because the "results from" clause incorporates common law standards of

factual causation, so too does it incorporate an intervening cause defense. *See id.*[16]

An "intervening cause" has three characteristics. *See E.I. du Pont de Nemours & Co. v. McCain*, 414 F.2d 369, 375 (5th Cir. 1969) (products liability and negligence action).[17] First, it's a separate "act or omission" by an independent agent that the defendant didn't control. *Id.* Second, it severs the causal connection between a defendant and the claimed injury so it becomes the immediate cause of the injury itself. *Id.*; *accord Moyer v. Martin Marietta Corp.*, 481 F.2d 585, 591 (5th Cir. 1973) (holding in wrongful death action that "[a]s many cases put it, a new and unforeseeable force breaks the causal chain").[18] Third, it couldn't have been reasonably foreseen by the defendant. *Id.* In short, the causal relationship

---

[16] This Court's pre-*Burrage* decision in *Webb* doesn't change this result. Although *Webb* held a defendant's conduct needn't have proximately caused a drug death for the enhancement to apply, it involved a death enhancement based on actual distribution, not mere possession with intent to distribute. *See* 655 F.3d at 1254. Further, in *Muller*, this Court acknowledged *Webb* had left the intervening cause exception issue undecided. 819 Fed. App'x at 701 n.6.

[17] In *Bonner v. City of Prichard*, this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down by close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

[18] *See supra* note 17.

between the defendant and the harm ceases to exist when the "continuum" between a defendant's conduct and the ultimate harm "is occupied by the conduct of deliberative and autonomous decisionmakers." *Dixon v. Burke County, Ga.,* 303 F.3d 1271, 1275 (11th Cir. 2002) (§ 1983 equal protection action).

District courts have ruled theft can constitute an intervening cause sufficient to break the causal chain. For example, in *Carter v. Nat'l R.R. Passenger Corp.*, 2020 WL 2475085, *8 (C.D. Cal. Jan. 24, 2020), a plaintiff's admitted theft broke the causal chain in her retaliation claim. Similarly, in *State of W. Va. ex rel. Poulos v. Fidelity & Cas. Co. of New York*, 263 F. Supp. 88, 91 (S.D. W.Va. 1967), an automobile theft was an intervening cause of a car accident when the owner had failed to lock his ignition prior to the theft of the car and a crash. And those rulings aren't surprising, because this Court has long held "a criminal act generally breaks the chain of causation"; that's because "a person usually has no reason to foresee the criminal acts of another." *Sosa v. Coleman*, 646 F.2d 991, 993–94 (5th Cir. Unit B June 1981) (applying Florida law).[19]

---

[19] *See supra* note 17.

### c. Lebarron had sufficient evidence to present an intervening cause defense

Lebarron elicited evidence at trial that he told others not to provide J.B. with drugs and that J.B. had stolen drugs in the past. Nobody could say for certain whether Lebarron was awake or asleep in the bedroom when J.B. exited the room with objects in her hands. The government couldn't show exactly where J.B. got the drugs that killed her.

Moreover, the intervening cause facts of this case differ from those in *Rodriguez*, on which the district court relied. *See supra* Statement A.3. The difference is *Rodriguez*'s facts were insufficient to constitute an intervening cause. *See* 279 F.3d at 951–52. There, a hotel employee found a man who had snorted heroin "unconscious and snoring loudly" in the hallway. *Id.* at 949. The employee dragged him to his hotel room, where he later died. *Id.* The employee's failure to call paramedics for help could not be considered an intervening cause of his death, even if such an argument existed. *Id.* at 951–52.

Moreover, that defendant admitted at sentencing that he had distributed the drugs that killed the victim. *Id.* at 952. *Rodriguez* reasoned that the hotel employee's actions were foreseeable and "naturally resulted" from that sale of the drugs. *Id.* at 952. There was no evidence that

the death "resulted solely" from negligent actions of the employee. *Id.* So, any intervening action couldn't have broken "the chain of legal causation." *Id.*

Here, unlike *Rodriguez*, Lebarron didn't admit to distribution. And the jury was instructed to convict Lebarron for either distribution *or* possession with intent to distribute the controlled substances. *See* Doc. 241. There was also evidence here that J.B.'s death "resulted solely" from her stealing drugs, because she had stolen drugs in the past. *See* Doc. 270 at 80–81. Lebarron had ordered others shortly before J.B.'s death not to provide J.B. with drugs. *Id.* at 113. No video footage showed where J.B. got the drugs she injected that day. Nobody saw J.B. prepare the drugs she ingested (meaning that she could've grabbed them from Lebarron's personal or distribution pile just as easily as she could've pulled them out of her own pocket).

> **5. Continued misinterpretation of the death enhancement's "use of such substance" and "results from" clauses could lead to dubious consequences that Congress never envisioned**

It's easy to imagine bizarre circumstances in which a death could result from the *same* substance that was once possessed by a defendant who had intent to distribute it *to others* but never actually distributed *to*

*the victim*, where holding the defendant criminally responsible for that death would be too farfetched for Congress to have envisioned without speaking more clearly about it. *See, e.g.*, Doc. 372 at 139–46; *King*, 2006 WL 2367339, *3.

For example, imagine an individual who possesses a brick of cocaine, a schedule II controlled substance, in his home with plans to eventually distribute it. Upon falling asleep, his dog carries the brick and buries it in the back yard. Years later, a new homeowner discovers the brick while gardening and, being an addict lacking any self-control, snorts it all at once and dies. Does the death enhancement unambiguously require that the original homeowner be held criminally responsible for that death? Or should the lack of knowing or intentional distribution or the dog's intervening act of burying the cocaine sever the connection between the defendant's criminal possession and the victim's death?

Another potential scenario might involve a college student with ADHD. He has a Ritalin prescription, a schedule II controlled substance. He intends to share some with a friend who is curious whether the Ritalin might help him study more efficiently. But before he can share any, the student's roommate sees the pills and, mistaking them for his own

vitamins, takes some without permission and dies. Does the death enhancement require that the student potentially serve a life sentence for his roommate's death from overdosing on his ADHD medication?

Now imagine a pharmacist fills a prescription for morphine, a schedule II controlled substance, that she knows was not written for a legitimate medical purpose in the usual course of professional practice. The prescription isn't picked up. After the pharmacy closes, a janitor steals the prescription, heads to his favorite opium den, and dies after consuming it. Does the death enhancement apply, or was the theft an intervening cause?

Finally, imagine a post-partum woman who is sent home from the hospital with an oxycodone prescription for managing her pain. She hasn't finished her prescription and she plans to lend some of hers to her sister-in-law, who also just had a baby, but ran out of her own oxycodone prescription. Before she can lend it to her, however, her curious teenaged son decides to swallow a few pills and dies. Could she be imprisoned for life for the death of her son, or did she not commit any criminal *actus reus* with a criminal *mens rea* that triggered the death enhancement?

These examples illustrate just some of the shocking consequences that Congress couldn't possibly have envisioned that would inevitably arise if knowing or intentional actual distribution that ultimately reached the victim weren't required as part of the death enhancement or if an intervening cause exception weren't permitted when the enhancement is charged along with mere possession with intent to distribute. Ordinarily, tragic accidents like those described above don't lead to the strict liability imposition of mandatory life sentences.

In such a world, perhaps the only checks on whether these individuals would be prosecuted for the death enhancement would be prosecutorial discretion or jury nullification. But prosecutorial discretion can malfunction. *E.g.*, *Yates v. United States*, 574 U.S. 528, 531–49 (2015) (federal fish prosecution under Sarbanes-Oxley Act); *Bond v. United States*, 572 U.S. 844, 851–52 (2014) (federal prosecution of jilted wife who attempted to injure her husband's lover by placing household chemicals on a doorknob, a mailbox, and the woman's car door under Chemical Weapons Convention Implementation Act).[20] And there's "'no right'" to

---

[20] Plus, prosecutorial discretion, such as it is, depends on the whim of whatever administration happens to be in charge at the time. *Compare* Jeff Sessions, Office of the Attorney General, Department Charging and

jury nullification. *Standefer v. United States*, 447 U.S. 10, 22 (1980) (citations omitted); *accord United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("Juries sometimes assume the power of nullification; still, nullification is no *right* of the jury." (emphasis in original)).

### C. The district court's grant of the government's motion *in limine*, which was based on its misinterpretation of the death enhancement, was an abuse of discretion

In granting the government's motion *in limine* (Doc. 234), the district court misinterpreted or overlooked the death enhancement's "use of such substance" and "results from" clauses. As a pure legal error, it constitutes an automatically reversible abuse of discretion, *see Williams*, 865 F.3d at 1337 ("an evidentiary ruling [based] on a legal error constitutes an abuse of discretion *per se*"); *Barner*, 441 F.3d at 1315 n.5 (even under abuse-of-discretion appellate review, "errors of law receive no

---

Sentencing Policy, at 1 (May 10, 2017) (prosecutors "should charge and pursue th[e] most serious, readily provable offense"), *with* Merrick Garland, Office of the Attorney General, Additional Department Policies Regarding Charges, Pleas, and Sentencing in Drug Cases, at 1 (Dec. 22, 2022) ("'charges that subject a defendant to a mandatory minimum sentence should ordinarily be reserved for instances in which the remaining charges ... would not sufficiently reflect the seriousness of the defendant's criminal conduct, danger to the community, harm to victims' and 'such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation'").

deference"), so long as it was either structural or not harmless. *See infra* Argument I.D.1–2.

### D. That abuse of discretion requires vacation of the judgment so the death enhancements in counts one and two can be retried

The error was either structural or not harmless. As such, the judgment should be vacated so the death enhancements in counts one and two can be retried.

#### 1. The error was structural

The error was structural and requires automatic reversal. By preventing Lebarron from presenting a defense based on J.B.'s theft, the "defect affect[ed] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Because it fundamentally affected the structure of the judicial proceedings, it isn't subject to harmless error analysis, *id.* at 309–10, and instead requires automatic reversal, *Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001).

Structural errors exist "only in a very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468–69 (1997). One such class is when "a judge in a criminal trial … 'enter[s] a judgment of conviction or

direct[s] the jury to come forward with such a verdict, regardless of how overwhelming the evidence may point in that direction.'" *Fulminante*, 499 U.S. at 294 (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73 (1977)). Another is when a district court deprives a defendant of the Fifth and Sixth Amendment rights to present a defense against all elements of a charged offense.[21]

When the district court took away Lebarron's constitutional right to present a defense to the death enhancement based on J.B.'s theft, it relieved the prosecution of its burden. That was the functional equivalent of entering a judgment of conviction or directing the jury to come forward

---

[21] The Fifth Amendment "guarantees that no one will be deprived of liberty without 'due process of law,'" whereas the Sixth Amendment affords "'the right to a speedy and pubic trial, by an impartial jury.'" *United States v. Gaudin*, 515 U.S. 506, 509–10 (1995). Together, these amendments "[give] a criminal defendant the right to demand that a jury find him guilty" beyond a reasonable doubt "of all the elements of the crime with which he is charged." *Id.* at 511; *accord In re Winship*, 397 U.S. 358, 361 (1970). As such, the Fifth and Sixth Amendments grant defendants the right "to present a defense." *United States v. Bidwell*, 451 Fed. App'x 853, 855 (11th Cir. 2012) (citation omitted). That's because the "standard of fairness require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Indeed, "[e]ven more fundamental to a personal defense than the right to self-representation … is an accused's right to present his own version of events in his own words." *Rock v. Arkansas*, 483 U.S. 44, 52 (1987).

with a guilty verdict on the death enhancement. It also deprived Lebarron of his constitutional right to present his defense. In both ways, the district court's order (Doc. 234) qualified as a structural error. Thus, his convictions on the death-enhanced charges in counts one and two should be vacated without regard to harmlessness.

### 2. Alternatively, whether constitutional or nonconstitutional, the error still wasn't harmless

Even if the error wasn't structural, it still wasn't harmless.

This Court assesses harmlessness under two standards, depending on whether the error was constitutional or nonconstitutional. *United States v. Pon*, 963 F.3d 1207, 1227–28 (11th Cir. 2020). "A constitutional error is harmless if the government proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 1227 (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967)). "A nonconstitutional error, on the other hand, is harmless unless it 'resulted 'in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict.''" *Id.* (citations omitted). Under both standards, the government bears the burden of persuasion. *Id.* Here, the error was constitutional, *see supra* note 21, but Lebarron should prevail under either standard.

Although Lebarron was allowed to elicit testimony about J.B.'s drug thefts, he was forbidden from arguing it undermined the death enhancement as triggered by his possession-with-intent-to-distribute or conspiracy charges. Had Lebarron been permitted to argue J.B.'s theft intervened to cause her death, or that the death enhancement required his knowing and intentional distribution, it would've substantially affected the verdict. That's because the jury easily could've found J.B. stole Lebarron's drugs. And if Lebarron's interpretation of the death enhancement's "use of such substance" and "results from" clauses is correct, that's all he'd need to obtain acquittals on the death-enhanced counts. Thus, his defense's exclusion substantially prejudiced him.

## CONCLUSION

The Court should vacate the judgment and remand for a new trial on the death-enhanced charges in counts one and two.

Respectfully submitted,

/s/ Thomas Burns
Thomas A. Burns
Shannon C. Reese
BURNS, P.A.
301 West Platt Street, Suite 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com
sreese@burnslawpa.com

*Court-appointed counsel for*
*Justin Case Lebarron*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)'s type-volume requirement. As determined by Microsoft Word 2010's word-count function, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and 11th Circuit Rule 32-4, this brief contains 12,249 words.

2.    This brief further complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and with Federal Rule of Appellate Procedure 32(a)(6)'s type-style requirements. Its text has been prepared in a proportionally spaced serif typeface in roman style using Microsoft Word 2010's 14-point Century Schoolbook font.

July 19, 2023                /s/ Thomas Burns
                                       Thomas A. Burns

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the original and four paper copies of the foregoing brief with the Clerk of Court via CM/ECF and regular mail on this 19th day of July, 2023, to:

> David J. Smith, Clerk of Court
> U.S. COURT OF APPEALS FOR THE
>    ELEVENTH CIRCUIT
> 56 Forsyth Street N.W.
> Atlanta, GA 30303

I FURTHER CERTIFY that I served a true and correct copy of the foregoing brief via CM/ECF on this 19th day of July, 2023, to:

> AUSA Dawn A. Tiffin

I FURTHER CERTIFY that I served a true and correct copy of the foregoing brief via email on this 19th day of July, 2023, to:

> Justin Case Lebarron (73478-018)
> USP Coleman II
> P.O. Box 1034
> Coleman, FL 33521

July 19, 2023

/s/ Thomas Burns
Thomas A. Burns